25CA1583 G5 Ranch v Carr 07-09-2026

COLORADO COURT OF APPEALS

---

Court of Appeals No. 25CA1583
Montezuma County District Court No. 22CV30055
Honorable William Young Furse, Judge

---

G5 Ranch LLC,

Plaintiff-Appellee,

v.

William S. Carr and Camille R. McWhorter,

Defendants-Appellants.

---

JUDGMENT AFFIRMED IN PART AND REVERSED IN PART,
AND CASE REMANDED WITH DIRECTIONS

Division V
Opinion by JUDGE YUN
Lipinsky and Schutz, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced July 9, 2026

---

Gibbs Dye, LLP, Andrew J. Gibbs, Neil P. Cherubin, Littleton, Colorado, for
Plaintiff-Appellee

Taft Stettinius & Hollister LLP, Tamir Goldstein, Harshwinder K. Badhesha,
Theodore O'Brien, Denver, Colorado, for Defendants-Appellants

¶ 1     In this easement case, defendants, William S. Carr and Camille R. McWhorter (jointly, the Carrs), appeal five orders that the district court entered in favor of plaintiff, G5 Ranch LLC, on its C.R.C.P. 105(a) claim and certified as final under C.R.C.P. 54(b). The Carrs contend that the court erred by (1) finding the instrument creating the easement unambiguous; (2) ruling that G5 could fence the entire length of the easement; (3) rejecting their affirmative defense of laches; (4) relocating the easement due to mutual mistake; and (5) denying their right to a jury trial on factual issues affecting their pending legal claims.  Both parties also request awards of their respective appellate attorney fees and costs. We affirm in part, reverse in part, and remand the case for further proceedings consistent with this opinion.

## I.     Factual Background

¶ 2     The Carrs and G5 dispute the scope of an easement that the previous owners of their properties — Katherine and the late Daniel Bjorkman (the Bjorkmans) and John and Janet Harris (the Harrises) — agreed to in writing (the Agreement).

¶ 3     The Bjorkmans previously owned both the land now owned by G5 (the North Property) and the land now owned by the Carrs (the

South Property).  To access both properties, the Bjorkmans used their private road — known as the Historic Access Road — which branches off the nearest public road, County Road M.  Starting from Road M, the Historic Access Road curves northeast, through an RV resort operated by the Bjorkmans on the South Property, before continuing into the North Property.

¶ 4    In 2012, the Bjorkmans sought to sell the North Property, which contained a ranch, to the Harrises while retaining the South Property.  To reach the North Property from Road M, the Harrises would have needed to travel the Historic Access Road, passing through the RV resort's guest sites.  Both parties wanted to avoid the Harrises driving trailers, tractors, and cattle through the crowded RV resort to reach the ranch on the North Property.  Accordingly, as part of the sale, the parties executed and recorded the Agreement, which, among other provisions, granted the Harrises two road access easements.

¶ 5    In the "Recitals" section, the Agreement says, in relevant part, "Harris will obtain a new entry easement, located on [the South Property] as described herein, which will connect into the [H]istoric

2

[A]ccess [R]oad for the [North Property]. The parties desire to set forth their agreement relative to road access and maintenance."

¶ 6     The parties documented their agreement on road access in paragraphs 1.1 through 1.4 of subsection 1 of the Agreement, titled "Road Access and Maintenance." Through paragraph 1.1, the Bjorkmans conveyed to the Harrises an easement — the Entry Easement — on which they could construct a new road — Harris Road — to reach the North Property from Road M:

> Bjorkman has granted . . . Harris, a 60 foot wide, non-exclusive, perpetual easement over [the South Property], described on [the 2012 survey] as New 60' Road and Utility Easement, 30 feet on either side of the centerline described [in the 2012 survey] ("Entry Easement"), for the purpose of ingress, egress, utilities, and construction, use and maintenance of a road, entry features, landscaping, fences, and utilities to be located within the Entry Easement.

This paragraph goes on to say that the Bjorkmans would credit the cost of Harris Road's construction toward the Harrises' purchase price for the North Property, and that the Harrises must build Harris Road "within the Entry Easement" and "within a reasonable amount of time after the closing date."

¶ 7    Paragraph 1.2 granted the Harrises a second easement — the Historic Access Road Easement — that allowed them to use the existing Historic Access Road to reach their property from Road M:

> Bjorkman has also granted . . . Harris, a 60 foot wide, non-exclusive, perpetual easement over [the South Property], 30 feet on either side of the centerline of the [H]istoric [A]ccess [R]oad on [the South Property], as approximately described [in the 2012 survey] to the point of intersection with the Entry Easement . . . for the purpose of ingress, egress, use and maintenance of the road, and utilities located or to be located if necessary within the Historic Access Road.

¶ 8    Paragraph 1.2 further provided that, upon the completion of Harris Road, the Bjorkmans and the Harrises would each have their own primary access road for entering their respective properties from Road M:

> After completion of [Harris Road] within the Entry Easement, the Entry Easement shall be Harris' primary entry access from [Road M], and the [Historic Access Road] shall be used by Harris as a secondary access only for emergency purposes and utilities as necessary. Bjorkman shall continue to use the historic entry access within the Historic Access Road . . . as Bjorkman's primary access, and may only use the Entry Easement as a secondary access for emergency purposes as necessary.

¶ 9     Paragraph 1.3 acknowledged that both easements were for the benefit of the Bjorkmans and the Harrises, stating, "The Entry Easement and Historic Access Road [Easement] are for the benefit of the Harris Property and the Resort Property as described in paragraph 1.2." This paragraph also clarified that the Harrises "shall have the right to grant an easement to adjacent property owners to use the Entry Easement and the Historic Access Road for access and utility purposes."

¶ 10    Because the planned Harris Road would merge into the northernmost segment of the Historic Access Road within the South Property, paragraph 1.4 sets forth the parties' respective maintenance responsibilities:

> After the initial construction of [Harris Road] within the Entry Easement, Harris shall be solely responsible for all reasonable maintenance of said road (including cost thereof) to the point of intersection with the Historic Access Road, from that point within the Historic Access Road to the [North] Property, and within the [North] Property, except only for any damage caused by Bjorkman or its agents, guests, invitees, representatives or contractors, which shall be Bjorkman's responsibility to repair. . . . Bjorkman shall be solely responsible for all reasonable maintenance of the Historic Access Road (including cost thereof) to the point of

intersection with the Entry Easement, except only for any damage caused by Harris or its agents, guests, invitees, representatives or contractors, which shall be Harris's responsibility to repair.

¶ 11     Finally, subsection 5 of the Agreement section titled "General Provisions" provides that the Agreement runs with the land and binds all future owners of the North and South Properties. The Harrises and Ms. Bjorkman (individually and as trustee for her husband's trust and attorney-in-fact for her husband) executed the Agreement.

¶ 12     The Agreement, the accompanying warranty deed for the North Property, and the 2012 survey were all recorded with Montezuma County, in which the North Property and the South Property are located. The 2012 survey visually depicts the Entry Easement relative to the Historic Access Road and Road M, identifying the starting point for the Entry Easement.



2012 Survey Showing Legal Location of the Entry Easement
Relative to the Historic Access Road

¶ 13 After recording the documents, Ms. Bjorkman and Mr. Harris determined where Harris Road should be built by walking the property together and placing marker flags. They agreed that Harris Road should merge into the northernmost segment of the existing Historic Access Road within the South Property.

¶ 14 Harris Road was constructed in 2012. On its west side stood the RV resort guest sites, a wedding ceremony site, and half of the golf fairway. To the east were the remainder of the fairway, the Bjorkmans' mobile home, several employees' mobile homes, a large pond, and other recreational amenities for resort guests. The aerial photograph below shows the locations of the Historic Access Road,

Harris Road, and Road M in relation to each other and the area where Harris Road and the Historic Access Road overlap:



Aerial Photo of the South Property

¶ 15     After Harris Road was built, the Bjorkmans used the Historic Access Road to enter the RV resort from Road M. However, the Bjorkmans used Harris Road as their main access from Road M to their own mobile home and other eastern facilities. In addition, the Bjorkmans crossed Harris Road daily to travel between the western and eastern halves of the South Property. At the time, the Harrises did not object to these uses of the Entry Easement.

¶ 16    In 2016, Ms. Bjorkman, in her capacity as trustee for her husband's trust, sold the South Property to the Carrs, who took over operations of the RV resort. The Carrs added a second wedding ceremony site on the eastern half of the South Property and converted part of the old fairway into a dog park, linking the two halves with a hiking trail. Like the Bjorkmans, the Carrs routinely crossed Harris Road to access the eastern half of their property, again without any objection from the Harrises. Nearly a decade later, as Mr. Harris began negotiations to sell the North Property to G5, he objected for the first time to the Carrs' use of Harris Road to access the eastern portion of their property.

¶ 17    In 2022, the Harrises completed the sale of the North Property to G5. G5 then objected to the Carrs' nonemergency use of Harris Road, arguing that the Agreement plainly barred such use. G5 filed a declaratory judgment action against the Carrs under C.R.C.P. 105(a). Among other things, G5 sought to define the scope of the Entry Easement through five judicial decrees:

> (i) the Entry Easement is valid, ongoing, and enforceable; (ii) the Agreement is valid, ongoing, and enforceable; . . . (v) the [Carrs] have no right to prevent or hinder [G5's] construction of improvements on the Entry

Easement . . . ; (vi) the [Carrs] have no right to use the Entry Easement, except in case of an emergency; . . . [and] (ix) the [Carrs] may not construct a gate across the Entry Easement . . . .

¶ 18 After finding the Agreement unambiguous, the court entered partial summary judgment in favor of G5 and entered all five judicial decrees. The court then determined that, before the Carrs' pending legal counterclaims could proceed to a jury trial, it needed to resolve two issues at a bench trial: (1) the location of the Entry Easement relative to Harris Road and (2) the Carrs' use rights where the Historic Access Road overlaps with the Entry Easement.

¶ 19 Following the bench trial, the court relocated the Entry Easement based on a finding of mutual mistake and concluded that the Carrs had no right to use *any* portion of the Entry Easement except for emergencies — even where it overlaps with their primary access road. The court later clarified that the Entry Easement's precise relocation corresponded to the location of Harris Road as actually built.

¶ 20 The Carrs appeal all five orders.

10

## II.    Finding of Unambiguity

¶ 21    The Carrs contend that the district court erred by finding that the Agreement language creating the Entry Easement was unambiguous.  They further argue that the court erred by concluding that the Agreement unambiguously (1) limited the Carrs' right to use the Entry Easement except for emergencies and (2) gave G5 the right to fence off the entire length of the Entry Easement.  We agree that the district court erred.

### A.    Additional Background

¶ 22    In January 2024, the court held an evidentiary hearing to determine whether paragraphs 1.1 through 1.4 of the Agreement were ambiguous.  The court framed the issues as whether the Agreement "permits [G5] to construct fencing within the defined 'Entry Easement'" and "whether the [Carrs] may use the same Entry Easement for non-emergency purposes."  G5 argued that the Agreement clearly authorized it to construct fencing within the Entry Easement and barred the Carrs from using the Entry Easement for any nonemergency purposes.  The Carrs, however, argued that the Agreement was ambiguous regarding the scope of use, noting that both they and the Bjorkmans had routinely used

the Entry Easement for a decade without objection from the Harrises.

¶ 23    Based on *Lazy Dog Ranch v. Telluray Ranch Corp.*, 965 P.2d 1229 (Colo. 1998), the court noted that it had the discretion to conditionally admit extrinsic evidence to determine whether the Agreement was ambiguous, with the understanding that such evidence would be struck if the court found the Agreement unambiguous.  At the hearing, the court heard testimony from several witnesses.  The court described such testimony as follows:

> Tom Morse testified that he was the transaction broker who represented both Mr. Bjorkman and Mr. Harris in the sale of the North Property.  Morse described . . . the parties' mutual desire to [have] . . . separate entrances.  Per Morse, Bjorkman didn't want to endure Harris' agricultural traffic traveling through the RV Park (South Property) and Harris wanted to avoid traveling through the RV Park to access his property.  Additionally, Harris sought a sense of privacy which could be accomplished through separate entrances.  Finally, Morse testified that both Bjorkman and Harris wanted the Agreement to contain easement usage exceptions for emergency situations.

> Like Morse's testimony, John Harris described a need for access to the North Property.  Harris testified his primary access was via the Entry Easement and the Historic Access Road was to

12

be used only in case of an emergency. Conversely, Harris stated Bjorkman's primary access was via the Historic Access Road with emergency, secondary access being available by way of the Entry Easement. Finally, Harris addressed his interpretation of the term "nonexclusive" easement at issue by recalling that because either party could use the other's easement for emergency purposes, they became nonexclusive.

While other witnesses including Ms. Bjorkman recalled periods of time when use of the Entry Easement went beyond emergency purposes and the relationship between property owners was more cordial than present, such events and potential waivers are not particularly relevant here nor dispositive of the parties' intent. Likewise, Ms. Bjorkman's speculative testimony regarding fences and entry features is not helpful to the Court's determination of the issues. Ms. Bjorkman credibly recalled not being involved in the negotiation of the Agreement and instead was far more participatory in water issues.

¶ 24 Following the hearing, the court issued an order concluding that the Agreement is "straightforward and unambiguous" — a determination unaltered by the testimony presented by the parties. Although the court found that Mr. Morse's and Mr. Harris's testimony was relevant and compelling concerning the parties' original intent, it found Ms. Bjorkman's testimony "not particularly relevant here nor dispositive of the parties' intent." Ultimately,

though, the court determined that "[n]o testimony or evidence presented had altered" its "initial interpretation of the Agreement" as "straightforward and unambiguous."

¶ 25    In September 2024, the district court issued an order granting G5's motion for partial summary judgment. As relevant to this appeal, the court incorporated its prior finding of unambiguity to declare:

> (i) the [E]ntry [E]asement is valid, ongoing, and enforceable,
>
> (ii) the Agreement, which creates the easement, is valid, ongoing, and enforceable,
>
> (iii) the [Carrs] have no right to prevent or hinder Plaintiffs' construction of improvements on the [E]ntry [E]asement, pursuant to the Agreement,
>
> (iv) the [Carrs] have no right to use the [E]ntry [E]asement, except in the case of an emergency, and
>
> (v) [The Carrs] may not construct a gate across the [E]ntry [E]asement.

¶ 26    Because paragraph 1.1 of the Agreement explicitly lists "fences" followed by "within the Entry Easement," the court reasoned that the Agreement plainly authorized G5 to build improvements on the Entry Easement, like a north-south fence

14

running along both sides of the Entry Easement. The only limit on the installation of "fences" was that they be "within" the Entry Easement. Because paragraph 1.2 of the Agreement states that the South Property owners "may only use the Entry Easement as a secondary access for emergency purposes as necessary," the court reasoned that any nonemergency use was strictly disallowed. Although the Carrs argued this outcome contradicted the word "nonexclusive" in paragraphs 1.1 and 1.2, the court explained that the availability of emergency use satisfied the "nonexclusive" descriptions.

¶ 27    After the court determined that the Agreement was unambiguous, G5 constructed a fence along both sides of the Entry Easement, starting seventy-five feet north of Road M, crossing the intersection with the Historic Access Road, and extending to the southern border of the North Property. In addition, G5 installed several locked gates along the Entry Easement, including the segment where it intersects the Historic Access Road. The Carrs allegedly received a code to the gates for emergency access.

## B. Standard of Review and Relevant Law

¶ 28    We review de novo the existence and scope of an expressly created easement by interpreting the conveyance instrument. *Gold Hill Dev. Co., L.P. v. TSG Ski & Golf, LLC*, 2015 COA 177, ¶ 43. If the language of the instrument creating an easement clearly and completely addresses the issue at hand, the court enforces the easement as written to effectuate the parties' intent. *Lazy Dog Ranch*, 965 P.2d at 1236; *see also* Restatement (Third) of Prop.: Servitudes § 4.1 cmt. d (A.L.I. 2000) ("Expressly created servitudes are typically the result of contractual transactions," and the principles of contract law "should be applied to determine the intent of the parties and the meaning of the terms expressed.").

¶ 29    If a conveyance instrument is ambiguous, the court must consider extrinsic evidence concerning the relevant "circumstances surrounding the grant" to determine the parties' intent, including

> the location and character of the properties burdened and benefited by the servitude, the use made of the properties before and after creation of the servitude, the character of the surrounding area, the existence and contours of any general plan of development for the area, and consideration paid for the servitude.

*Lazy Dog Ranch*, 965 P.2d at 1236-37 (quoting Restatement (Third) of Prop.: Servitudes § 4.1 cmt. c (A.L.I., Tentative Draft No. 4, 1994)). An instrument is ambiguous if, when construed as a whole, it is susceptible of more than one reasonable interpretation. *See Hoang v. Assurance Co. of Am.*, 149 P.3d 798, 801 (Colo. 2007); *Dep't of Transp. v. First Place, LLC*, 148 P.3d 261, 264 (Colo. App. 2006). However, extrinsic evidence cannot be used to contradict an instrument's plain language. *Lazy Dog Ranch*, 965 P.2d at 1237. Thus, "the language used in creating a servitude ordinarily should be interpreted to accord with the meaning an ordinary purchaser would ascribe to it in the context of the parcels of land involved." *Id.* (citation omitted).

¶ 30     If the conveyance instrument is "silent as to a matter that affects the operation of the [easement]" or remains ambiguous "even after reference to all the relevant circumstances," then the court should consider the "system of 'default rules' that supply necessary terms of the easement." *Id.* (citing Restatement (Third) of Prop., introductory note to chapter 4, §§ 4.3 to 4.12 (A.L.I., Tentative Draft No. 4, 1994)). Generally, the default rules apply a reasonableness standard to the specific issue raised because "it is presumed that,

absent clear authorization in the written instrument for the particular use, the parties to the original instrument did not intend unreasonable use of the easement." *Id.* at 1237-38.

¶ 31 An easement is a legal property right that grants the easement holder (the dominant estate) a nonpossessory interest in land that is owned by another (the servient estate). *Wright v. Horse Creek Ranches*, 697 P.2d 384, 387 (Colo. 1985). This nonpossessory interest "generally authorizes limited uses of the burdened property for a particular purpose." Restatement (Third) of Prop.: Servitudes § 1.2 cmt. d (A.L.I. 2000). The easement holder may use the land as expressly allowed by the conveyance instrument and for any uses reasonably necessary to fulfill the easement's intended purpose, provided that such use does not unreasonably interfere with the servient estate's use and enjoyment of its land. *Amada Fam. Ltd. P'ship v. Pomeroy*, 2021 COA 73, ¶ 67. The owner of the servient estate retains legal title and the right to possess the land. *Wright*, 697 P.2d at 387; *see Lazy Dog Ranch*, 965 P.2d at 1234 (An easement "does not carry any title to the land over which it is exercised, nor does it serve to dispossess the landowner.").

¶ 32    While exclusive easements permit the dominant estate to exclude others, Colorado law presumes easements to be nonexclusive.  *Skidmore v. First Bank of Minneapolis*, 773 P.2d 587, 589 (Colo. App. 1988); *Lazy Dog Ranch*, 965 P.2d at 1234 n.5.  A nonexclusive easement means that the landowner of "the servient estate enjoys all the rights and benefits of proprietorship consistent with the burden of the easement; while the rights of the owner of the dominant estate are limited to those connected with use of the easement."  *Lazy Dog Ranch*, 965 P.2d at 1234.

¶ 33    In sum, the servient estate owner may make "any use of the burdened property" unless (1) the use was expressly disallowed by the conveyance instrument; (2) the use unreasonably interferes with the easement holder's enjoyment of the easement for its intended purpose; or (3) the conveyance instrument "expressly designate[s] [the easement] as 'exclusive.'"  *Id.* at 1234 n.5, 1238.  Conversely, the dominant estate owner may use the land (1) as expressly allowed in the conveyance instrument; or (2) as reasonably required to enjoy the purposes expressed in the conveyance instrument, unless such use would unreasonably interfere with the enjoyment of the servient estate.  *Amada Fam.*, ¶ 67.

## C. Discussion

¶ 34    We disagree with the district court's finding that the Agreement unambiguously barred the Carrs from using the Entry Easement outside of emergencies and allowed G5 to construct fencing along the length of the Entry Easement.

### 1. The Carrs' Right to Use the Entry Easement

¶ 35    Construing the Agreement as a whole, it does not support the district court's finding that the Carrs' use of the Entry Easement is limited solely to emergencies. Paragraph 1.2 provides that "the Entry Easement shall be Harris' primary entry access" from Road M, while "Bjorkman may only use the Entry Easement as a secondary access for emergency purposes as necessary."

¶ 36    This language only limits the Carrs' use of the Entry Easement as road access to and from Road M. In other words, the Agreement clearly prohibits the Carrs from using the Entry Easement as road access to Road M except in emergencies "as necessary." However, the Agreement is silent regarding other uses — such as crossing Harris Road east-to-west and vice versa to access either half of the South Property. Thus, the Agreement does not unambiguously prohibit these other uses.

¶ 37    This narrower interpretation is supported by the other language in the Agreement:

- Paragraph 1.2 expressly designates the Entry Easement as "non-exclusive," meaning that the Carrs "enjoy[] all the rights and benefits of proprietorship consistent with the burden of the easement." *Lazy Dog Ranch*, 965 P.2d at 1234.

- Paragraph 1.3 describes the Entry Easement as benefitting both the Harris Property (G5's property) and the Resort Property (the Carrs' property).

- According to the Recitals, the Agreement does not limit all conceivable uses of the Entry Easement but expressly limits only a subset of uses — those uses "relative to road access."

¶ 38    Our conclusion is not altered by the district court's attempt to reconcile the "non-exclusive" designation. After finding that the Agreement permitted only emergency use of the Entry Easement by the Carrs, the district court reasoned that this restriction was consistent with the "non-exclusive" designation because the Carrs retained "emergency" use of the Entry Easement. But this interpretation effectively grants G5 exclusive or fee simple control of

the Entry Easement because virtually all landowners possess the right to enter a neighbor's property in emergencies. *See* Restatement (Second) of Torts § 197 (A.L.I. 1965); § 18-1-702, C.R.S. 2025. Thus, by disregarding the meaning of "non-exclusive," the court's interpretation fails to give harmonious effect to the whole Agreement.

¶ 39 The "non-exclusive" designation further underscores that the Agreement is ambiguous as to the full scope of the Carrs' permitted uses of the Entry Easement. By finding that the Carrs were limited to emergency use, the district court presumed the Agreement must enumerate all permitted uses and penalized the Carrs for any omission. But this approach is incorrect. As owners of the servient estate burdened by a "non-exclusive" easement, the Carrs are presumed to retain "all the rights and benefits of proprietorship" except those expressly limited by the Agreement. *See Lazy Dog Ranch,* 965 P.2d at 1234.

¶ 40 For all these reasons, we reverse the district court's finding that the Agreement unambiguously restricted the Carrs' use of the Entry Easement to emergencies and remand the case to the district court to consider extrinsic evidence to determine the parties' intent.

On remand, the court must consider the relevant "circumstances surrounding the grant"; apply the default rules, specifically, Restatement (Third) of Property: Servitudes § 4.9 (A.L.I. 2000); and determine the reasonableness of the Carrs' retained uses, such as whether the Carrs' crossing over Harris Road unreasonably interferes with G5's enjoyment of the Entry Easement for road access. *Lazy Dog Ranch*, 965 P.2d at 1236-37.

### 2. G5's Right to Fence Off the Entry Easement

¶ 41 Reading the Agreement as a whole, it is ambiguous whether G5 may construct fencing along the entire length of the Entry Easement. Again, the Entry Easement is described as "non-exclusive," meaning that G5 may use it (1) as expressly allowed in the Agreement or (2) as reasonably required to fulfill the Entry Easement's purpose — so long as such use does not unreasonably interfere with the Carrs' enjoyment of the South Property. *See Amada Fam.*, ¶ 67.

¶ 42 The Agreement does not define the scope of permissible "fences." Paragraph 1.1 states only that the Entry Easement is created "for the purpose of ingress, egress, utilities, and construction, use and maintenance of a road, entry features,

23

landscaping, fences, and utilities to be located within the Entry Easement." While the word "fences" contemplates some fencing, it does not specify the extent of the fencing, nor does it expressly authorize fencing the entire length of the Entry Easement. The district court thus erred by concluding that the Agreement *expressly* authorized continuous fencing along the length of the Entry Easement.

¶ 43    Instead, the Agreement's reference to "fences" is ambiguous because it is susceptible to two reasonable interpretations. On one hand, the term "fences" could be read to grant G5 the right to construct fencing anywhere within the Entry Easement. Thus, it would support the district court's view that the Carrs could not prevent G5's fencing so long as the fencing remained within the easement. On the other hand, the "non-exclusive" designation preserves the Carrs' right to use the Entry Easement alongside G5 — except as expressly limited by the Agreement — and to enjoy the South Property free from unreasonable interference. Accordingly, under a reasonable interpretation of the "fences" provision, G5 may not construct a continuous fence bisecting the servient estate, as such fencing would contradict the

"non-exclusive" grant and unreasonably interfere with the Carrs' enjoyment of their property. *See Wykoff v. Barton*, 646 P.2d 756, 759 (Utah 1982) (rejecting the dominant estate's request to fence off a "private road" access easement because such a fence "would have the practical effect of depriving [the servient estate owner] entirely of the use of her land").

¶ 44 We therefore reverse the court's finding that the Agreement unambiguously allowed G5 to fence off the Entry Easement and remand the case to the district court to consider extrinsic evidence to determine the parties' intent. On remand, the court must consider the relevant "circumstances surrounding the grant"; apply the default rules, specifically, Restatement (Third) of Property: Servitudes § 4.10 (A.L.I. 2000); and determine the reasonableness of G5's lengthwise fence — namely, whether the fence unreasonably interferes with the Carrs' enjoyment of the South Property. *Lazy Dog Ranch*, 965 P.2d at 1236-37.

### III. G5's Right to Fence Overlapping Segment

¶ 45 The Carrs contend that the district court erred as a matter of law by permitting G5 to build a lengthwise fence that obstructs the Historic Access Road. We agree.

## A. Additional Background

¶ 46  The Entry Easement and the Historic Access Road overlap at the northernmost segment of the South Property. At the southern end of that overlap, Harris Road terminates and merges into the Historic Access Road, which continues to the southern boundary of G5's North Property. G5's fence extends through this overlapping segment and, therefore, across the Historic Access Road up to the southern property line. G5 installed locked gates in the fence on both the east and west sides of the overlapping segment. William Carr testified that this effectively cut off the longstanding access route that the Carrs used to reach the eastern half of their property. Consequently, they were forced to build a new road to reach that side of their property.

¶ 47  Following a two-day bench trial, the district court ruled that G5 had "the right to install fencing within the entirety of the Entry Easement, including the portion that intersects with the Historic Access Road," so long as G5 supplied the Carrs with the code or keys to the locked gates. The Carrs objected, arguing that this impeded their primary access road. The court, however, concluded that the Carrs' "emergency-use only" limitation applied to the entire

Entry Easement, including its intersection with the Historic Access Road, relying on the language in paragraph 1.2 stating that the Carrs "may only use the Entry Easement as a secondary access for emergency purposes as necessary." The court disregarded paragraph 1.2's language that the Carrs "shall continue to use the historic entry access within the Historic Access Road . . . as [their] primary access," reasoning as follows:

> This language does not grant unconstrained access to the entirety of the Historic Access Road. Rather, it identifies where [the Carrs] may access the South Property from County Road M . . . . The "historic entry access within the Historic Access Road" identifies a specific point in the Historic Access Road that [the Carrs] must use for non-emergency access to/from the South Property. Otherwise, [the Carrs'] right to use the Historic Access Road, as the servient estate owners, is limited by the Agreement. The Agreement forbids [the Carrs] from using the Entry Easement for any non-emergency purpose, without regard to location within the Entry Easement and including the intersection with the Historic Access Road.

## B. Discussion

¶ 48    The district court's decision to permit G5's fencing — after concluding that the Carrs were limited to emergency use in the overlapping segment — contradicts the Agreement's plain language.

27

Paragraph 1.2 expressly states the Carrs "shall use the Historic Access Road" as their "primary access," while G5 may use it only "as a secondary access for emergency purposes and utilities as necessary." By authorizing G5 to install locked, gated fences at the intersection of the Entry Easement and Historic Access Road, the court effectively granted G5 — whose rights to the Historic Access Road are limited — unilateral control over the Carrs' "primary" access route.

¶ 49    We have already determined that the Agreement does not *unambiguously* authorize G5 to fence the entire Entry Easement and have remanded the issue for further proceedings. Paragraph 1.1 permits "fences" within the Entry Easement, but it does not authorize G5 to erect fencing that interferes with the Carrs' primary access road. Interpreting the Agreement to permit G5 to fence off the Entry Easement where it overlaps the Carrs' primary access road finds no support in that document's text. Fencing — together with locked gates — at this intersection does more than regulate the Carrs' use; it effectively eliminates their independent access right and imposes a substantial new burden on the servient estate. *See Lazy Dog Ranch v. Telluray Ranch Corp.*,

28

923 P.2d 313, 317 (Colo. App. 1996) ("Locked gates are usually considered an unreasonable burden, even if the easement holder is provided with keys.").

¶ 50    By ruling otherwise, the court undermined its own interpretation of the nearly reciprocal language governing G5's primary access road. When the Agreement designated the Entry Easement as G5's "primary entry access" and limited the Carrs' use to "emergency purposes," the court interpreted this language as allowing the Carrs only emergency use. Yet when the Agreement designated the Historic Access Road as the Carrs' "primary access" and limited G5's use to "emergency purposes," the court nevertheless restricted the Carrs to emergency use in the overlapping segment. Neither party's rights should be subordinate to the other's at this intersection. The only reasonable interpretation is to remove the obstruction — namely, the fences — at the overlapping segment so that both parties retain their primary access roads.

¶ 51    Accordingly, we reverse the district court's finding that the Agreement permitted G5 to fence off the Entry Easement where it

overlaps the Historic Access Road. Such an interpretation of the Agreement is incorrect as a matter of law.

IV. Affirmative Defense of Laches

¶ 52 The Carrs contend the district court erred by determining that the doctrine of laches does not apply. The Carrs argue that because the North Property owners had not previously exercised their right to construct a fence, the doctrine of laches precludes G5's claim. We disagree.

¶ 53 The district court rejected the Carrs' laches defense, finding that they "failed to establish [G5] had a duty to build a fence." The court explained that "[t]he plain text of the Agreement does not require [G5] to build a fence, nor does it establish a time limit for when they may build a fence." It therefore concluded that "[t]he doctrine of laches does not apply to parties who have no duty to act."

¶ 54 The availability of an affirmative defense is a question of law subject to de novo review. *In re Marriage of Johnson,* 2016 CO 67, ¶ 9. Laches is an affirmative defense requiring a showing that a party's unconscionable delay in enforcing its rights prejudiced the opposing party. *Calhan Chamber of Com. v. Town of Calhan,*

166 P.3d 200, 204 (Colo. App. 2007). "A laches defense comprises three elements: (1) full knowledge of the facts by the party against whom the defense is asserted; (2) unreasonable delay by that party in pursuing an available remedy; and (3) intervening reliance by and prejudice to the party asserting the defense." *In re Marriage of Kann*, 2017 COA 94, ¶ 40.

¶ 55     We agree with the district court that laches is not a viable defense here. The North Property owners — the Harrises and later G5 — had the right, but not the obligation, to construct fencing within the easement. Laches cannot defeat a claim when the alleged delay concerns an action that the party was never required to undertake. *See City of Thornton v. Bijou Irrigation Co.*, 926 P.2d 1, 74 (Colo. 1996) ("[L]aches is not applicable to a party who has no duty to act."). We therefore affirm the district court's ruling on summary judgment dismissing the Carrs' laches affirmative defense.

V.     Relocation of the Entry Easement Based on Mutual Mistake

¶ 56     The Carrs contend that the district court erred by using its equitable power to relocate the Entry Easement based on the parties' alleged mutual mistake regarding the true corner

monument marking the starting point of the Entry Easement. While we agree that mutual mistake is not a valid basis for relocation in this case, we affirm the court's relocation of the Entry Easement on other grounds. *See Deutsche Bank Tr. Co. Ams. v. Samora*, 2013 COA 81, ¶ 38 ("An appellate court may affirm the trial court's ruling based on any grounds that are supported by the record.").

## A. Additional Background

¶ 57 At the bench trial, the parties disputed whether the correct corner monument was the "Maness Monument" or the "Gibbons Monument." The 2012 survey, recorded with the Agreement and the Bjorkman-Harris warranty deed, identified the Maness Monument as the starting point for measuring the Entry Easement. The Carrs presented evidence that Harris Road was built predominantly east of the Entry Easement when measured by using the Maness Monument as the starting point. Conversely, if the Entry Easement were measured by using the Gibbons Monument as the starting point, Harris Road would align with the Entry Easement, though the Entry Easement would not reach Road M. Testifying for G5, Mr. Harris explained that, shortly after executing

the Agreement, he and Ms. Bjorkman chose the route of Harris Road by walking the path together and placing flag markers without reference to the 2012 survey.

¶ 58    The court relocated the Entry Easement by designating the Gibbons Monument — not the Maness Monument — as the true corner monument.  The court found that the surveyor who conducted the 2012 survey must have intended to use the Gibbons Monument, citing an expert who testified that using the Maness Monument as the starting point would have caused the Entry Easement to extend at least twenty-six feet into the North Property — an "unrealistic" blunder.  The court also noted that Ms. Bjorkman and Mr. Harris jointly walked and staked the intended route of Harris Road, and that its as-built location remained undisputed for twelve years.

¶ 59    Accordingly, the court's bench trial order required that the 2012 survey be reformed to designate the Gibbons Monument as the corner monument, "[m]aking the [c]enterline of Harris Road the [s]ame as the [c]enterline of the Entry Easement."  At G5's request, the court later clarified that its ruling on the Gibbons Monument was intended only to correct the 2012 survey's reference to the

Maness Monument, and it declared that the "centerline of Harris Road as it presently exists, from County M to [North Property], is hereby declared to be the Centerline of the Entry Easement."

### B. Standard of Review and Relevant Law

¶ 60 We review a judgment following a bench trial as a mixed question of fact and law. *See Kroesen v. Shenandoah Homeowners Ass'n*, 2020 COA 31, ¶ 55. We review the district court's factual findings for clear error but review its legal conclusions de novo. *Id.* The court's interpretation of a recorded instrument entails legal conclusions we review de novo. *Gold Hill*, 378 P.3d at 828.

¶ 61 Under Colorado law, when a land survey accompanies a deed, the land surveyor must establish a "monument" on the ground — a durable cap bearing the surveyor's license number placed atop a pole at the corner point of a property boundary, or "as close as practicable to the true corner." §§ 38-51-102 to -105, C.R.S. 2025. The monument serves as the starting point for measuring the contours of an easement in accordance with its written legal description. *Id.*

¶ 62 Under the doctrine of mutual mistake, a court may exercise its equitable discretion to modify a written instrument only if the

evidence "clearly and unequivocally" demonstrates that the "instrument does not represent the true agreement of the parties." *Md. Cas. Co. v. Buckeye Gas Prods. Co.*, 797 P.2d 11, 13 (Colo. 1990); *see also Ranch O, LLC v. Colo. Cattlemen's Agric. Land Tr.*, 2015 COA 20, ¶¶ 18, 35 (citing *Md. Cas. Co.*, 797 P.2d at 13, to uphold the district court's reformation of an easement based on mutual mistake). A mutual mistake occurs when both parties to the instrument share the same "erroneous conception" about its terms, such as the easement's location. *Ranch O, LLC*, ¶ 18. "An essential prerequisite to a court's power to reform a contract on the ground of mutual mistake is the existence of a *prior* agreement that represents the actual expectations of the parties and provides the basis upon which a court orders reformation." *Md. Cas. Co.*, 797 P.2d at 13 (emphasis added).

¶ 63    Additionally, Colorado law permits a written contract to be modified by the parties' course of performance. *Woods v. Monticello Dev. Co.*, 656 P.2d 1324, 1327 (Colo. App. 1982); *see also Lazy Dog Ranch*, 965 P.2d at 1235-36 (stating that the instrument creating an easement is interpreted according to the interpretive rules of contract law). "Modification of a written agreement must be

demonstrated by clear and satisfactory evidence" showing "[t]he same meeting of the minds . . . as was necessary to make the contract in the first instance." *Grizzly Bar, Inc. v. Hartman*, 454 P.2d 788, 791 (Colo. 1969). When, as here, the instrument states that modifications must be made in writing, the conduct must be even clearer: It must be "so pervasive that in the eyes of a reasonable [person] it 'spoke louder than [the] word' . . . of the [written modification] clause, which in effect counseled against reliance on conduct indulging default." *Woods*, 656 P.2d at 1327 (quoting *Westinghouse Credit Corp. v. Shelton*, 645 F.2d 869, 874 (10th Cir. 1981)).

¶ 64    Indeed, courts in other jurisdictions have permitted the easement holder and the servient estate owner to relocate an easement by mutual consent — express or implied from use and acquiescence — even when the written instrument specifies a different location. *Red Mountain, LLC. v. Fallbrook Pub. Util. Dist.*, 48 Cal. Rptr. 3d 875, 891 (Ct. App. 2006); *see also Johnstone v. Bettencourt*, 16 Cal. Rptr. 6, 8-9 (Ct. App. 1961) (parties' mistaken use of a route different from the actual route amounted to relocation by mutual consent); *Henning v. Neisz*, 268 N.E.2d 310,

316 (Ind. Ct. App. 1971) (easement holder who used a new route for over five years was found to have "acquiesced in the relocation of the easement and . . . given his implied consent to the servient estate owner for such relocation"); *Ericsson v. Braukman*, 824 P.2d 1174, 1177 (Or. Ct. App. 1992) (implicit agreement to relocate the easement when the servient estate owners did not object to the easement holder's improvement and use of a new location); *Vrazel v. Skrabanek*, 725 S.W.2d 709, 711-12 (Tex. 1987) (relocation by mutual consent and estoppel when the servient estate owner obstructed the platted easement and permitted use of an improved alternate route); *Buxton v. Murch*, 457 S.E.2d 81, 84-85 (Va. 1995) ("Even where there has been a definite location of an easement, it may be changed with the express or implied consent of the persons interested. Such consent may be implied from the acts and acquiescence of the parties, and an estoppel to claim a former location to be the true one arises from acquiescence in the change." (quoting *Wagoner v. Jack's Creek Coal Corp.*, 101 S.E.2d 627, 630 (Va. 1958))).

## C. Discussion

¶ 65    As a matter of law, reformation of the 2012 survey on the basis of mutual mistake was improper.  First, the record lacks a "prior agreement that represents the actual expectations of the parties," which is an "essential prerequisite to a court's power to reform a contract on the ground of mutual mistake."  *Md. Cas. Co.*, 797 P.2d at 13.  Second, the evidence does not "clearly and unequivocally" demonstrate that both parties to the Agreement intended to use the Gibbons Monument as a reference point.  *Id.* The court relied on the testimony of G5's surveyor, who explained that the 2012 survey likely identified the Maness Monument instead of the Gibbons Monument by mistake.  But the evidence showed that the parties apparently charted the course of Harris Road without reference to either monument.  And crucially, the stated purpose for the Agreement was to provide Harris, and later G5, with a primary entry access road from Road M — using the Gibbons Monument as a reference point would have resulted in the Entry Easement not reaching Road M.

¶ 66    Nevertheless, the district court relied on several other grounds — chiefly, the parties' conduct — to support relocating the

38

Entry Easement. The court found that, after executing the Agreement, Ms. Bjorkman and Mr. Harris physically walked and staked the intended route of Harris Road without regard to the 2012 survey's specifications. They simply selected a route that made practical sense to both of them. For the next twelve years, the Bjorkmans and Harrises, and later the Carrs, routinely used Harris Road as built.

¶ 67    During that period, neither the Bjorkmans nor the Carrs objected to Harris Road's location. This course of conduct clearly and satisfactorily demonstrates the parties' mutual agreement to vary the terms of the instrument by situating Harris Road in its present location. *See Woods*, 656 P.2d at 1327; *see also* Restatement (Third) of Prop.: Servitudes § 4.8 cmt. c (A.L.I. 2000) ("Even if the instrument specifies a different location, the location is fixed by the placement of the improvements unless the language or circumstances lead to the conclusion that the initial location is temporary."). Thus, although we do not hold that the parties made a mutual mistake, based on the parties' course of performance, we affirm the court's decision to modify the Entry Easement's location

39

so that Harris Road, as built, becomes its centerline.  *See Deutsche Bank*, ¶ 38.

## VI.   Right to a Jury Trial

¶ 68    The Carrs contend that the district court improperly deprived them of their right to a jury trial by resolving two issues at the bench trial — (1) the location of the Entry Easement relative to Harris Road and (2) the Carrs' use rights where the access roads overlap — because the resolution of these issues affected their pending legal counterclaims.  We are not persuaded.

¶ 69    First, the Carrs' use rights where the roads overlap do not present a factual issue because the district court treated this matter as a question of law.  *See Owens v. Tergeson*, 2015 COA 164, ¶ 17 ("The interpretation of a deed and the determination of whether it is ambiguous are questions of law . . . .").  In its order following the bench trial, the court merely clarified that its prior partial summary judgment ruling — that "the [Carrs] have no right to use the Entry Easement, except in case of an emergency" — applied to the portion of the Entry Easement overlapping the Historic Access Road.  Although we reverse the district court's order on this point, this does not mean that the Carrs were deprived of

their right to a jury trial. The interpretation of an instrument remains a matter for the court to resolve, regardless of whether the language is ambiguous or clear. *See Moeller v. Ferrari Energy, LLC*, 2020 COA 113, ¶ 15.

¶ 70 Second, the Carrs were not entitled to a jury trial on the remaining issue under C.R.C.P. 105(a): determining the location of the Entry Easement relative to Harris Road. *See* C.R.C.P. 105(a) (requiring the court to "grant full and adequate relief so as to completely determine the controversy and enforce the rights of the parties" and allowing the court "at any time after the entry of the decree [to] make such additional orders as may be required in aid of such decree"). This issue required the court to exercise its equitable power to reform the conveying instrument. *See Bd. of Comm'rs v. Timroth*, 87 P.3d 102, 105 (Colo. 2004) ("Reformation of an instrument is an equitable remedy."); *Casey v. Colo. Higher Educ. Ins. Benefits All. Tr.*, 2012 COA 134, ¶ 48 ("Remedies for mistake, such as contract reformation and rescission, are equitable in nature."). Although the court addressed factual issues at the bench trial, "[i]t is not the nature of the issues of fact to be tried which determines whether there is a right to a jury, but the

41

character of the action in which they are presented." *Fed. Deposit Ins. Corp. v. Mars*, 821 P.2d 826, 830 (Colo. App. 1991). "If the relief sought is equitable in nature, there is no right to a jury trial." *Id.* Because the relief sought was reformation of the conveying instrument, the Carrs were not entitled to a jury trial on that issue.

¶ 71 Thus, the court did not violate the Carrs' right to a jury trial by resolving these two issues. The Carrs retain their right to a jury trial on any legal counterclaims that have yet to be resolved.

## VII. Attorney Fees and Costs

¶ 72 Both the Carrs and G5 seek appellate attorney fees and costs under C.A.R. 39.1 and section 5(g) of the Agreement. Section 5(g) provides: "Should litigation be necessary to enforce any term or provision of this Agreement, or to collect any portion of amounts payable under this Agreement, all reasonable litigation expenses, collection fees, court costs, and attorney fees shall be paid by the non-prevailing party." Given our resolution of this appeal, neither party qualifies as "the non-prevailing party" under section 5(g). *See In re Marriage of Kann*, ¶ 83 (denying request for appellate attorney fees where both parties succeeded in part). Accordingly, we deny

both parties' requests for appellate attorney fees and costs under C.A.R. 39.1 and section 5(g).

## VIII. Disposition

¶ 73    Our disposition is as follows:

- We reverse the district court's finding that the Agreement unambiguously restricted the Carrs' use of the Entry Easement to emergencies and remand for further proceedings to determine the parties' intent.

- We reverse the court's finding that the Agreement unambiguously allowed G5 to fence off the entire Entry Easement and remand for further proceedings to determine the parties' intent.

- We reverse the court's finding that the Agreement permitted G5 to fence off the Entry Easement where it overlaps the Historic Access Road.

- We affirm the court's dismissal of the Carrs' affirmative defense of laches on summary judgment.

- We affirm the court's decision to modify the location of the Entry Easement so that Harris Road, as it currently exists, becomes the centerline of the Entry Easement.

- We affirm the court's denial of a jury trial regarding (1) the location of the Entry Easement relative to Harris Road and (2) the Carrs' use rights where the access roads overlap.

- We deny both parties' requests for appellate attorney fees and costs.

- We remand the case to the district court for further proceedings consistent with this opinion.

JUDGE LIPINSKY and JUDGE SCHUTZ concur.